IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| DAWN V. MARTIN and | ) | |
| MIGUEL GALLARDO, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 1:11-cv-1118-AJT-TCB |
| | ) | |
| LONG AND FOSTER REAL ESTATE | ) | |
| INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>**MEMORANDUM OPINION**</u>

Plaintiffs Dawn Martin and Miguel Gallardo, appearing *pro se*, claim that their former

landlord, defendant Johannes Brondum, as well as his real estate agents, defendants Long and

Foster Companies, Long and Foster Real Estate, Inc., Long and Foster Realtors, Susan

Haughton, and Patricia Knight (collectively, "the Long and Foster Defendants"), engaged in

discrimination on the basis of race and national origin in violation of the Fair Housing Act, 42

U.S.C. § 3601 *et seq.*, also codified as Title VIII of the Civil Rights Act of 1968, and the

Virginia Human Rights Act, Va. Code § 2.2-3900 *et seq.* Second Am. Compl. 26.[1]  More

specifically, Plaintiffs allege that Defendants unlawfully denied them the opportunity to purchase

the townhouse, owned by defendant Brondum, which they had been renting for over seven years

through Long and Foster, as evidenced in part by the sale of that townhouse to "White, non-

---

[1] In their Second Amended Complaint, Plaintiffs also raised claims for fraud, defamation of
character, breach of contract, intentional infliction of emotional distress, and violations of the
Virginia Residential Landlord and Tenant Act. *See* Second Am. Compl. 30-36. Those claims
were dismissed by Order dated February 10, 2012 [Doc. No. 43].

1

Hispanic" buyers. *Id.* at 27-30.[2]  Plaintiffs seek compensatory and punitive damages in the total

amount of $1,605,000.[3]  Plaintiffs also seek "an Order requiring Defendants to retract their

defamatory statements about [Plaintiffs], within the multiple listing service system, to mailings

to the residents of Windy Hill complex, a written apology to [each plaintiff], a written landlord

reference, stating that [Plaintiffs] maintained the house in good condition, and any other means

by which Defendants' false statements can be corrected." *Id.* at 37-38.

　　　Presently pending are Defendant Brondum's Motion for Summary Judgment [Doc. No.

95], the Long and Foster Defendants' Motion for Summary Judgment [Doc. No. 92], and

Plaintiffs' Motion for Summary Judgment [Doc. No. 105].  A hearing was held on these motions

on July 17, 2012, following which the Court orally granted Defendants' motions and denied

Plaintiffs' motion, with those decisions to be confirmed in a subsequently issued memorandum

opinion and order, which the Court now issues.  Upon consideration of the Motions, the

memoranda and exhibits in support thereof and in opposition thereto, the arguments of counsel at

the hearing on July 17, 2012 [Doc. No. 124], and for the reasons stated from the bench in open

court and in this Memorandum Opinion, the Court finds that there are no triable issues of

material fact, and that Defendants are entitled to judgment as a matter of law.

---

[2] *See also* Pls.' Mem. 1-2 ("Defendants violated: 1) 42 U.S.C. § 3604(a) by refusing to negotiate with [Plaintiffs] for the sale of the house, at 5444 Chieftain Circle, Alexandria, Virginia, where they had been tenants for 7 1/2 years; and 2) 42 U.S.C. § 3604(d) by representing to [Plaintiffs] that the house in question was not available for sale, when it was, in fact, so available.").

[3] Plaintiffs seek the following specific amounts: $400,000 in compensatory damages for each plaintiff for "the deprivation of [their] civil rights and the intentional emotional distress caused by Defendants' discriminatory conduct;" $100,000 for "the disruption of [plaintiff Martin's] legal . . . practice, and loss of income due to time taken from her practice;" $5,000 in lost income for plaintiff Gallardo due to time taken from work; $150,000 for each plaintiff "in punitive damages for Defendants' intentional discrimination . . . on the basis of [Plaintiffs'] race"; $100,000 for each plaintiff "for defamation of [Plaintiffs'] character[s]"; and $100,000 for each plaintiff "in punitive damages for Defendants' defamation of [Plaintiffs'] character[s]." Second Am. Compl. 37-38

# I. BACKGROUND

## A.   Factual Background

The Court finds that the following facts are undisputed:

Beginning at least as early as September 2003, Defendant Brondum ("Brondum") owned the townhouse located at 5444 Chieftain Circle, Alexandria, Virginia (hereinafter, "the townhouse"). Long and Foster managed the townhouse as a rental unit on behalf of Brondum. Patricia Knight Lambert ("Knight") was the Long and Foster agent in charge of managing the townhouse as a rental unit. Plaintiff Dawn Martin is an African-American female and plaintiff Miguel Gallardo is a Black Hispanic male. *See* Pls.' Statement of Facts ¶¶ 2, 4; *see also* L&F Defs.' Opp'n 6 (not disputing this fact).

On September 15, 2003, Martin entered into a two-year Deed of Lease, through Long and Foster, to rent the townhouse for $1,800 per month. Martin paid a two-month security deposit and a $600 pet deposit, for a total deposit of $4,200. Paragraph 3 of the Deed of Lease states in relevant part: "If any installment of rent is not received by Agent or Landlord within five (5) days from the due date, Tenant covenants and agrees to pay as additional rent the sum of $180.00." Although Gallardo never completed an application to reside at the townhouse and his name was not on the lease for the property, he resided with Martin in the townhouse from the beginning of the September 2003 lease.

Following the expiration of the lease's two-year term on October 1, 2005 and Martin's refusal to sign a new lease, Martin was permitted to continue her occupancy of the townhouse on a month-to-month basis pursuant to Paragraph 15 of the Deed of Lease. During the course of her tenancy, up to and including 2011, disputes arose between Martin and Long and Foster

3

pertaining to the townhouse, including, among others, the timeliness and the amount of Martin's rental payments after she was assessed late fees.

On January 31, 2011, acting on instructions from Brondum, Knight of Long and Foster sent Martin an email giving her 30-days' notice to vacate the townhouse. Knight also delivered to Martin two separate written 30-day notices to vacate. The first notice to vacate stated that "the owner is returning to the property." *See* Ex. 12 to L&F Defs.' Mem. The second notice to vacate stated that "[t]he owner will be placing the property on the market for sale." *See* Ex. 13 to L&F Defs.' Mem.

Following her receipt of the notices to vacate, Martin, without seeking or obtaining the consent of Long and Foster or Brondum, did not pay rent for February 2011. Rather, Martin called Paul Timpane, Knight's supervisor, and according to Martin, told Timpane that "if [Brondum] wanted to sell the house, we would be interested in buying it, if it is priced appropriately." *See* Ex. 14 to L&F Defs.' Mem., at 3. According to Martin, Timpane stated at that time, "Well, I don't know if [Brondum] is putting the house up for sale." And Martin recounted that Timpane "said he would get Mr. Brondum's e-mail address from [Knight] and e-mail him to tell him that I was interested in buying the house. . . . [Timpane] said that he would get back to me on Mr. Brondum's response to my request regarding buying the house." *Id.*

On February 17, 2011, Martin wrote a letter to Jeffrey S. Detwiler, President and Chief Executive Officer of The Long and Foster Companies, in which she stated, *inter alia*, that she was interested in purchasing the townhouse and commented as follows with respect to her ability to purchase the townhouse:

> Gallardo[] and I were approved for a mortgage last year, in the amount of $440,000. We actually did make an offer on a house, for $440,000, but the owners ended up not selling the house after all. I am an attorney and my income fluctuates depending on when cases are resolved. [Gallardo] has a stead[y]

> paycheck, as a federal law enforcement officer. Because I am currently handling a multi-million dollar case . . . we had decided to wait until this case is resolved and then use the attorneys' fees to buy our "dream house." We intended to stay here and continue renting in the meantime. In light of this January 31, 2011 notice, however, we have renewed and updated our prior mortgage application and expect pre-approval within a few days.

*Id.* at 3-4. Martin also complained about Knight's conduct in connection with her serving the 30-day notice to vacate.[4]

On February 18, 2011, in response to Martin's letter to Detwiler, Martin received an email from Joseph Amantangelo, Vice President, Residential Management and Rental Service Center, The Long and Foster Companies, Inc., indicating he would look into the matters Martin had raised and get back to her. *See* Ex. 17 to L&F Defs.' Mem. Before hearing further from Amantangelo, Martin sent an email to Amantangelo on February 18, 2011, which said:

> Long and Foster is holding $4,200 as a security deposit – an illegal deposit, totalling [*sic*] more than two months' rent. On January 31, 2011, I expressly asked Mr. Timpane to tell Mr. Brondum that I am interested in buying the house and he said that he would get back to me, but has not done so. If I am buying the house, the security deposit should be applied to the downpayment and I could also apply the rent toward it. I[t] cannot be applied to any purported "damages" if I am the one taking over ownership, as well as possession, of the house. I also don't think it's fair or reasonable that I should be charged a $190 late fee for February's rent while I am waiting to hear back about whether I can buy the house.
>
> I don't know whether to work on getting a mortgage to buy this house or to find a rental. We are in limbo here, while Long and Foster is holding $4,200 as a security deposit. I also do not have money to move and put down a month's security and the first month's rent on a new rental, while Long and Foster is

---

[4] In her letter to Timpane, Martin recounted the confrontation between Martin and Knight after Knight taped the 30-day notice to Martin's door: ". . . []Knight stood there looking right into my face – for what purpose, I don't know, other than some smug satisfaction at my distress. [Martin] said, 'I'll speak to the office.' [Knight] said (quite nastily), 'Who are you going to speak to? I'm the property manager, there's nobody else to speak to.' [Martin] said, 'I'll speak to someone above you. I'm not talking to you. You're horrible.'" *See* Ex. 14 to L&F Defs.' Mem., at 2. In the same letter, at footnote 2, Martin wrote "I have had previous discussions with [Knight], in which she has been rude, nasty, unprofessional, irrational, unreasonable, and vindictive. She appears to be on some sort of mission to assert power over me personally. I can only speculate as to her motives since I do not know how she treats other people." *Id.* at n.2.

> holding all of this money – nor can I put together a downpayment on a house for sale under such short notice and such circumstances.

Ex. W to Pls.' Mem., at 43-44. That same day, Timpane sent an email to Brondum advising him that Martin "is refusing to accept the notice [to vacate] and at this time will not be vacating the property as scheduled. I don't know what your plans are for the property but she has asked if you would negotiate selling to her? I doubt she can afford the property but it may be an easy way to make a deal." *See* Ex. N to Pls.' Mem., at 26. He also wrote, "I wanted to step into this situation since Ms. Martin is an attorney and also an extremely difficult person. . . . She has contacted all the Senior Executives at Long & Foster over this issue so be prepared for a fight from her." *Id.* at 27. In response to Timpane's February 18, 2011 email, Brondum wrote:

> Considering the difficulties this tenant has already caused, in addition to not having paid this month's rent (at least that is my understanding), I am not inclined to deal with her on any level, particularly given Mr. Timpane's comment doubting her ability to afford the property. <u>I want her out of the property at the end of her lease term, otherwise, we are to proceed to eviction immediately as I need to get the property on the market</u> and have plans to occupy in that property until it is sold. If she is interested in buying the property, she can hire a real estate agent who can make an offer through my agent. I am not going to deal with her directly under any circumstances, as she appears to be quite irrational.

Ex. N to Pls.' Mem., at 26 (underline in original). Five days later, on February 23, 2011, Martin again emailed Amantangelo, stating:

> As I have said repeatedly, if it is true, as [Knight] wrote in her 30 [day] notice to me, that Mr. Brondum wants to sell the house, we would like to discuss buying it. In fact, we just found a buyer who will buy it cash, outright, and rent to us, if Mr. Brondum does not want to wait for our approval on financing. In fact, the prospective buyer is our neighbor.

Ex. W to Pls.' Mem., at 42. Later that day, Amantangelo emailed Martin and stated:

> We have received direction from [Brondum] regarding the status of the lease. He has reiterated that the lease must end on the date you have been previously notified of, as March 2, 2011. [Brondum] informed Long & Foster that he does not want to engage in personal discussion with you regarding the property under any circumstance. That said, he noted that if you wish to make a formal contract

offer to purchase the property it must be made through his designated listing agent. The listing agents [*sic*] name is Susan Haughton, susan.haughton@longandfoster.com.

Ex. 17 to L&F Defs.' Mem.  The next day, February 24, 2011, Martin sent an email to

Haughton, which stated:

Please contact me regarding the listing price of the house and for additional discussions regarding buying the house, if the price is reasonable. . . . The primary issue for us is the price. . . . I believe that the last house built like this one, in this complex, sold for $379,000, with granite counter tops, newly painted, and, perhaps, hard wood floors, or at least new carpet. I may be confusing two houses that sold here regarding the floors.  If I buy it, which means staying in the house and not requiring Mr. Brondum to make any repairs, there should be an allowance [for] downgraded counter tops, floors (linoleum rather than tile) and appliances and the need for painting and carpeting.

Ex. 18 to L&F Defs.' Mem.; *see also* Ex. W to Pls.' Mem., at 57 (same).

The following day, on February 25, 2011, Brondum, accompanied by Knight, inspected

the townhouse and met Martin and Gallardo for the first time. *See* Pls.' Statement of Facts ¶ 34;

*see also* L&F Defs.' Opp'n 7 (not disputing this fact).  At that time, Brondum told Martin and

Gallardo that he was not selling the house but was going to occupy it himself. *See* Pls.'

Statement of Facts ¶ 36; *see also* L&F Defs.' Opp'n 7 (not disputing this fact).  Nevertheless, he

stated that if Plaintiffs were interested in purchasing the house they should contact Haughton.

He also said that even if he were not moving back into the house himself, he would never sell the

house for less than $440,000. *See* Pls.' Statement of Facts ¶ 37; *see also* L&F Defs.' Opp'n 7

(not disputing this fact).  During the February 25, 2011 inspection, Martin requested a move out

date of March 31, 2011 (60 days after the initial notice). *See* Pls.' Statement of Facts ¶¶ 41-42;

*see also* L&F Defs.' Opp'n 7-8 (not disputing this fact).  During the February 25, 2011

inspection, Knight asked if Gallardo lived in the house.  Neither she nor Brondum knew until

that date that Gallardo was residing at the property at 5444 Chieftain Circle.  Upon learning that

7

Gallardo was residing at the property, Knight said, "He's living here illegally! Illegally . . . He

should have filled out an application!" Ex. DD to Pls.' Mem., at ¶ 7. Brondum was concerned

over the condition of the townhouse as he observed it and later characterized the state of the

house, during the inspection, as having "dirt and grime all over the property," having "grunge on

the floor" of the kitchen, having "grunge and filth," with items "in [a] condition [that] was so

bad," and having an unpleasant odor. *See* Ex. 1 to L&F Defs.' Mem., at 250-51, 266-71, 275,

280, and 285-86.

Later that day following Brondum's visit, Martin, not having received a response to her

February 24, 2011 e-mail concerning her interest in purchasing the townhouse, sent another e-

mail to Haughton that stated:

> We are anxious to speak with you about a fair price for the house. We met with
> Mr. Brondum today. He referred us again to you regarding the sale of the house –
> although he also said that he is not sure that he wants to sell it and is actually
> planning to move back into it. Again, I would like to be clear on whether the
> house is for sale or not so that I can either make an offer on it or make plans to
> move.

Ex. 18 to L&F Defs.' Mem. That same day, February 25, 2011, Haughton responded by

email to Martin's emails, stating:

> During the last conversation I had with Mr [*sic*] Brondum he indicated he intended to
> move back into the property; as soon as I have had a chance to speak with him and see in
> what direction he intends to go I will be in touch. He did indicate to me earlier IF he
> decides to sell, he expects exclusive representation . . . . Again, as soon as I have clear
> direction from Mr [*sic*] Brondum, I will be back in touch about whether he plans to sell or
> move into the property.

Ex. 20 to L&F Def.'s Mem.

Two days later, on February 27, 2011, Brondum sent an email to Knight, Haughton,

Timpane, and Amantangelo, which stated:

> After considerable thought after the inspection I have notified Susan Haughton at
> Long and Foster that I have lost any interest in even entertaining the thought of an

8

offer regarding the sale of my property at this point in time; as mentioned several times, I was only contemplating this idea and it was basically only a fleeting thought and no official action was made per a firm verbal commitment or written contract. My decision is based on the state of the property and the potential financial requirements for improvements that could be levied against me during the pre-sale and inspection process.

Ex. N to Pls.' Mem., at 6. The following day, Haughton sent an email to Martin stating,

"Mr [*sic*] Brondum informed me today he is not interested in entertaining an offer for

sale as he will be moving back into the property." *See* Ex. 21 to L&F Defs.' Mem.

On March 1, 2011, apparently in response to Brondum's lack of interest in selling the

townhouse, as conveyed to her by Haughton on February 28, 2011, Martin sent an email to

Amantangelo which stated:

> I will follow up with a letter conveying to you the *hateful, spiteful and unprofessional* manner in which [Knight] handled this entire matter, and the manner in which she filled Mr. Brondum with poison. We were treated with incredible disrespect and hate in the home where we diligently paid rent, for nearly 8 years. There was absolutely no legitimate reason for this treatment, the insults and the baseless accusations. I cannot imagine that [Knight] treats *all* renters in the properties that you manage in this manner and still have kept her job all of these years. This leads me to conclude (as it did my fiancé, Miguel Gallardo . . .), that [Knight] must reserve this kind of hateful treatment for people of color. As you may know, I am African-American and Miguel is a Black Hispanic.

Ex. 22 to Defs.' Mem. (emphasis in original). Martin failed to vacate the townhouse by

March 2, 2011, as required under the 30-day notice to vacate, and she did not pay rent for

March 2011 or the previously withheld rent for February. On March 8, 2011, Brondum

filed an eviction action against Martin in Fairfax County General District Court, in which

he sought possession of the townhouse and damages.[5] Martin filed counterclaims,

including claims of racial discrimination.

---

[5] Fairfax County General District Court entered judgment against Martin and in favor of Brondum at trial on June 30, 2011, after Martin failed to appear. *See* Ex. 5 to L&F Defs.' Mem., at 124, 129-31.

On March 31, 2011, Martin and Gallardo vacated the townhouse. *See* Pls.' Statement of Facts ¶ 70; *see also* L&F Defs.' Opp'n 10 (not disputing this fact). In an email dated April 3, 2011, Brondum wrote to Haughton, "will also send you a crazy e-mail from the tenant [Martin] . . . a real piece of work." *See* Ex. KK to Pls.' Mem., at 9. By email dated April 4, 2011, Brondum wrote to Haughton, "the 'POS' has left and I'll be meeting [Knight] tomorrow afternoon to assess the damage and will let you know." *Id.* at 8. On April 5, 2011, Brondum wrote to Haughton:

> I did a walk-through of the place this afternoon with [Knight] . . . it is a TOTAL disaster . . . what we thought would be better after all of their stuff was out was not the case, because a lot of their stuff was covering up other damages; i.e., they had a mat on the patio that covered a grapefruit sized hole that they burnt completely through the patio deck floor . . . . Even [Knight] was saying it would be over a thousand dollars just to clean the place . . . total animals . . . we have a court date for 15 April and I want to sue her for as much as is necessary on the damages . . . .

*Id.* at 7. Haughton responded on April 5, 2011, to Brondum, stating, "As for her letter [referring to an email from Martin to Brondum that Brondum forwarded to Haughton], bully for her and her legal dictionary. She is so full of &$@* it is not funny. Working for justice in the world [referring to a statement in Martin's email signature], my arse." *Id.*

On April 12, 2011, Haughton sent an email to Brondum with information about a recent sale of a property similar to his. Also on April 12, 2011, Brondum sent an email to Haughton, stating:

> I just got back and will look over this again . . . . Knight contacted me today that they need to clean it and do the repair to the patio prior to the court date this Friday in order to serve the tenant [Martin] with the repair costs . . . . [A]t least that makes it a bit more of an incentive to put on the market . . .

*Id.* at 10. Later that day, Brondum sent another email to Haughton describing his finances and stating that he had an upcoming meeting with his accountant following which "we can go from there" and that "I think it is best to get it ready for the season, so that a potential buyer and fix-it-upper can get ready . . . ." *Id.*

> On April 18, 2011, Brondum sent an email to Haughton stating:

> I am going to meet [Knight] late Wednesday afternoon at the [property] to check things out and discuss the trial. Although I know there were some issues regarding the tenant's thought that I would sell the property and then said 'no' to her (and [Knight]), I am going to tell [Knight] that since there have been delays with the whole [property] issue it has caused me to make other living arrangements. My decision is further compounded that the damage was more than anticipated and that with all this drama from [Martin], I don't feel that I want to live there and will be putting it on the market 'as is'. . . . I don't know if this will come up as an issue in the court, but the way I feel is that it is my decision if I want to sell and to whom (and I can change my mind as needed). Additionally, assessing the lack of rent paid by the tenant I had reason to believe that she couldn't afford it and that she would drag this situation down another dark path. . . . Once I have discussed this with [Knight] we can move forward on the plan for putting it on the market.

*Id.* at 15. On April 20, 2011, Brondum wrote an email to Haughton that stated:

> The way I see it is the place is still basically trashed and would be too cost inhibitive and time consuming for me to reoccupy. . . . This is probably a good time to get it on the market from what I heard on the news about the sales of existing houses . . .

*Id.* at 14. That same day, Haughton responded by email to Brondum, explaining why she thought $375,000 was an appropriate listing price for the property.

> On April 21, 2011, Brondum signed an exclusive listing agreement with Long and Foster. On April 27, 2011, Haughton listed the property for sale, put a lockbox on the door to the property, and put a "For Sale" sign in the yard. That same day, Knight noticed the "For Sale" sign and sent an email to Brondum (which Brondum forwarded to Haughton) stating, "I noticed that there was a L&F sign there, I was unaware that you were going to sell the property. This

may make a difference with any damages that we can collect." *Id.* at 18.  Later that day,

Brondum and Haughton decided to remove the sign from the property; and in response to

Knight's April 27, 2011 email, Brondum wrote:

> Per our last meeting at the property I told you that I was going to probably sell it
> 'as is' due to all of the damages and the lack of time, money, and effort that I have
> to repair all that was damaged . . . financially after all that has happened (with
> consideration of my accountant's advice) [my decision] is to sell it and get what I
> can as opposed to it being a financial black hole, which it has been since the
> tenant stopped paying the rent.  In regards to Ms. Martin, my intent was to move
> in, but I had no idea how badly they damaged that place and for the reasons listed
> above I am now deciding to place it on the market.

*Id.* at 17.

On April 29, 2011, Brondum received an offer to purchase the property and on April 30,

2011, he accepted the offer.  The purchasers of the townhouse are white.  Brondum was never

aware of the race, ethnicity, or national origin of any of the individuals who made written offers

for the townhouse.  Neither Martin nor Gallardo ever submitted a written offer to purchase the

property after they were given Haughton's name and email address on February 23, 2011.

Haughton never met Martin or Gallardo until Haughton's deposition in May 2012, more than a

year after she listed the subject property for sale.  Haughton was not aware of how Martin or

Gallardo self-identified ethnically or racially until served with the instant lawsuit.

**B.     The Motions for Summary Judgment**

In his motion for summary judgment, Defendant Brondum argues that Plaintiffs cannot

prove facts that would allow a reasonable fact finder to conclude that Brondum took any

materially adverse actions against them or, even if he did, that there was a causal connection

between his actions and Plaintiffs' race or ethnicity.  Moreover, he argues that he has asserted

legitimate, nondiscriminatory reasons for not selling his property to Plaintiffs and Plaintiffs have

12

failed to show either that the articulated reasons are unworthy of credence or that intentional discrimination was the reason for Brondum's actions.

In their motion for summary judgment, the Long and Foster Defendants likewise argue that Plaintiffs failed to make a prima facie case of discrimination because they did not adduce facts sufficient to show that Defendants failed to make the property available for sale to Plaintiffs, pointing to communications with Plaintiffs advising them how to make an offer for the purchase of the townhouse and Plaintiffs' failure to make any offer. *See* L&F Defs.' Mem. 18-19. Additionally, Defendants argue that even if Plaintiffs had made a prima facie case, the only allegedly adverse action taken by the Long and Foster Defendants was Haughton's removal of the For Sale sign from the property, and the Long and Foster Defendants have asserted a legitimate, nondiscriminatory reason for this action – the then-pending state court litigation – which Plaintiffs have not shown was pretextual. *See id.* at 19-20.

In their motion for summary judgment, Plaintiffs contend that they are entitled to judgment as a matter of law based on direct evidence of Defendants' racial animus in connection with their alleged refusals to negotiate with Plaintiffs for the sale of the townhouse.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only if the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996). The party seeking summary judgment has the initial burden to show the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

13

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To defeat a properly supported motion for summary judgment, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original). Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the nonmoving party. *Id.* at 255; *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007). For cross-motions for summary judgment, "the Court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

### III. ANALYSIS

Title VIII of the Civil Rights Act of 1968, also known as the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a); *see also Matarese v. Archstone Pentagon City*, 795 F. Supp. 2d 402, 430 (E.D. Va. 2011) ("To prove a prima facie case of discrimination under the FHA, a

14

plaintiff must demonstrate that the housing action or practice being challenged was motivated by a discriminatory purpose or had a discriminatory impact.") (citing *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 986 (4th Cir. 1984)), *vacated in part on other grounds*, 468 F. App'x 283 (4th Cir. 2012). To satisfy the requirements of the statute, a plaintiff must show that discriminatory animus was a motivating factor, but they do not have to show that it was the primary or dominant purpose. *See Matarese*, 761 F. Supp. 2d at 362. In the absence of direct evidence of unlawful discrimination under the FHA, courts employ the burden-shifting analysis outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447, 1452 (4th Cir. 1990) ("The *McDonnell Douglas* scheme is a recognition that direct proof of unlawful discrimination is often difficult to obtain. It permits a plaintiff to make an initial showing, indirect in nature, that raises a presumption of illegality. This scheme is routinely used in housing and employment discrimination cases alike.").

Under the *McDonnell Douglas* framework, once a plaintiff proves a prima facie case that an action was based, at least in part, on discriminatory animus, the burden shifts to the defendants to show a legitimate nondiscriminatory reason for their actions. *McDonnell Douglas*, 411 U.S. at 802–803. If the defendants are able to present a legitimate, nondiscriminatory reason, the burden returns to plaintiff to demonstrate that the proffered reason was a pretext. *See id; Matarese*, 795 F. Supp. 2d at 431. To meet this burden to present evidence of pretext, Plaintiffs must demonstrate *both* that Defendants' proffered legitimate, nondiscriminatory reason was false, *and* that discrimination was, in fact, the real reason for the defendant's action. *See Hadeed v. Abraham*, 265 F. Supp. 2d 614, 623 (E.D. Va. 2003) ("To succeed [in showing the proffered legitimate nondiscriminatory reason was pretextual], the Plaintiffs must adduce sufficient evidence both that the reason was false, and that discrimination was the real reason.");

*St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515-16 (1993); *Price v. Thompson,* 380 F.3d 209,

217 n.5 (4th Cir. 2004) (explaining that "our laws impose liability only when 'the employer's

action was the product of unlawful discrimination' and do not impose liability simply because

'the employer's explanation of its action was not believable.'") (quoting *Hicks,* 509 U.S. at 514).

Contrary to Plaintiffs' contention, the Court finds as a matter of law that none of the facts

that Plaintiffs proffer as "direct evidence" constitutes legally sufficient direct evidence of racial

or ethnic animus.  For instance, none of the statements relied on contain explicit racial epithets

and, within the context in which the statements were made, cannot be said to evidence racial or

ethnic animus without undue inferences or presumptions. *See O'Connor v. Consol. Coin*

*Caterers Corp.,* 56 F.3d 542, 548 (4th Cir. 1995) (stating that direct evidence "would prove the

existence of a fact . . . without any inference or presumptions."), *rev'd on other grounds,*

*O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308 (1996).[6]  Therefore, to survive summary

judgment, Plaintiffs must adduce facts sufficient to satisfy the requirements of the *McDonnell*

*Douglas* burden-shifting regime.  For the reasons discussed below, the Court concludes that

Plaintiffs have failed to establish a prima facie case of housing discrimination and that, in any

event, Defendants have proffered legitimate, nondiscriminatory reasons for their conduct and

Plaintiffs have not adduced facts sufficient to raise an inference of pretext.

**A.   Prima Facie Case**

To prove a prima facie case of housing discrimination, a plaintiff must establish facts that

prove by a preponderance of the evidence (1) that they are members of a protected class, (2) that

they were denied a housing opportunity made available to others, and (3) that a discriminatory

purpose was a motivating factor in denying them that opportunity, although that purpose need

---

[6] The specific statements that Plaintiffs rely on as direct evidence are discussed at *infra* notes 12-13.

16

not be shown to be the dominant or primary purpose. Defendants do not challenge that Plaintiffs

are members of a protected class (Martin is African-American and Gallardo is Black Hispanic);

and the issue reduces to what Plaintiffs must show to establish the second and third elements of

their claim. Although courts have articulated differently what a plaintiff must show for that

purpose, the Court concludes that under the circumstances of this case, Plaintiffs can carry their

burden by presenting facts sufficient to establish that (1) they sought to purchase the townhouse;

(2) the townhouse was "available" for purchase; (3) they were financially qualified to purchase

the townhouse and satisfied Defendants' other nondiscriminatory requirements; and (4) they

were denied the opportunity to purchase the townhouse otherwise afforded to persons outside of

the protected class. *See, e.g., Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004) (applied

in the housing context in *Johnson v. York Simpson Underwood LLC*, No. 1:03-cv-1141, 2005

WL 1378848, at *5 (M.D.N.C. June 9, 2005)).[7]

Here, the record is sufficient to establish that the townhouse was "available" for purchase

beginning on April 27, 2011, and that after it became available, the townhouse was sold to

someone other than a member of the protected class. However, Plaintiffs have otherwise failed

---

[7] *See also Selden Apartments v. HUD*, 785 F.2d 152, 159 (6th Cir. 1986) (a prima facie case requires the plaintiff to show "(1) That he or she is a member of a racial minority; (2) That he or she applied for and was qualified to rent or purchase certain property or housing; (3) That he or she was rejected; and (4) That the housing or rental property remained available thereafter."); *Phiffer v. Proud Parrot Motor Hotel, Inc.*, 648 F.2d 548, 551 (9th Cir. 1980) (same); *Asbury v. Brougham*, 866 F.2d 1276, 1279-80 (10th Cir. 1989) ("In order to establish her prima facie case, plaintiff had to prove that (1) she is a member of a racial minority; (2) she applied for and was qualified to rent an apartment or townhouse . . . ; (3) she was denied the opportunity to rent or to inspect or negotiate for the rental of a townhouse or apartment; and (4) the housing opportunity remained available."); *see also HUD v. Blackwell*, 908 F.2d 864, 870-71 (11th Cir.1990) (explaining that a plaintiff "establishes a prima facie case by proving: (1) that the [purchasers] are members of a racial minority; (2) that the [purchasers] applied for and were qualified to purchase [the] house; (3) that [the seller] rejected the [purchasers]; and (4) that the house remained available thereafter."); *Pinchback*, 907 F.2d at 1451 (citing to the above Sixth, Ninth, and Tenth Circuits cases as examples of the proper formulation of the prima facie standard in a FHA case).

17

to establish their prima facie case. In this regard, Plaintiffs failed to establish that before April 27, 2011, the date on which the townhouse was first actually listed for sale, (1) Defendants refused to sell or negotiate for the sale of the townhouse on the same terms and conditions offered to persons outside the protected class (i.e. that Brondum had not yet made the decision to sell the townhouse but if Plaintiffs had an interest in buying it, they should make a written offer through Haughton); or (2) Plaintiffs satisfied the terms and conditions that were conveyed to them with respect to any existing opportunity to purchase the townhouse (i.e. that they send a purchase offer to Haughton). Plaintiffs also failed to establish that after Defendants made the townhouse available for sale on April 27, 2011, Plaintiffs made an offer to purchase the townhouse or that under the circumstances the Defendants had an obligation to solicit an offer from them, and if the Defendants had done so, Plaintiffs would have made an offer and were qualified to purchase the townhouse.

The undisputed evidence demonstrates, without any reasonable inferences otherwise, that before April of 2011, Brondum had not decided to sell the townhouse before moving into it. The undisputed evidence also shows that he finally decided to sell the townhouse, without first occupying it, on approximately April 20, 2011, that he signed an exclusive listing with Long and Foster on April 21, 2011, and that the townhouse was listed for sale on April 27, 2011. There is also no evidence in the record that, before the townhouse was officially listed for sale, Brondum or Long and Foster were soliciting or considering offers from potential buyers, or that potential buyers were told anything different than what the Plaintiffs were told as far as the availability of the townhouse or how to proceed if they had an interest in buying the townhouse.[8] In fact, the

---

[8] For this reason, Plaintiffs' reliance on *Pumphrey v. Stephen Homes, Inc.* is inapposite. 110 F.3d 60 (4th Cir. 1997) (unpublished). There, the seller told a black purchaser that a parcel of land was unavailable while telling white purchasers that the land was for sale. *Id.* at *1. Here, there is no evidence of disparate communications as between minority and white purchasers.

record shows that Plaintiffs were the *only* persons who were told to make an offer on the house, and how, before it was listed on April 27, 2011. In any event, Plaintiffs did not make an offer, as they were instructed. Rather, Plaintiffs identified issues that affected their ability to purchase the townhouse and what they regarded as essential concessions on Brondum's part before they would, or could, make such a purchase. *See Hadeed*, 265 F. Supp. 2d at 623 (explaining that an element of the prima facie case requires a showing that plaintiffs "tendered a valid offer to purchase and were qualified to purchase" the home). Brondum had no obligation to proceed with negotiations in the fashion Plaintiffs wanted. And the undisputed evidence shows that after the townhouse was officially for sale, Plaintiffs did not make an offer on it.

For the above reasons, the Court finds and concludes that Plaintiffs have failed to establish a prima facie case of housing discrimination. Nevertheless, the Court also finds that Defendants have articulated legitimate, nondiscriminatory reasons for any of the conduct relied upon by the Plaintiffs as evidence of discrimination, and there is no evidence in the record sufficient to raise an inference that any of that conduct was a pretext for discrimination.

**B.      Legitimate Nondiscriminatory Reasons and Pretext**

Defendants have articulated legitimate, nondiscriminatory reasons for why they did not sell the house to Plaintiffs: (1) before April 20, 2011, Brondum wanted to reoccupy the townhouse before selling it, so he needed Plaintiffs to vacate and the townhouse was not, in fact, actually for sale; (2) after April 20, 2011, once Brondum decided to sell, the Defendants' did not want to deal with the Plaintiffs because of Brondum's belief, based on Martin's own communications, that Plaintiffs could not afford to purchase the townhouse, and Brondum's general unwillingness to deal with Martin because of her conduct and the pending litigation between them. That conduct included withholding rent while at the same time attempting to

19

dictate terms of a potential sale, and later forcing Brondum to institute eviction proceedings and seek compensation for property damage that Brondum thought compromised his ability to both reoccupy the townhouse and to sell the townhouse at a reasonable price.

In the face of these legitimate, nondiscriminatory reasons, Plaintiffs have failed to assert facts sufficient to raise a reasonable inference that Defendants' proffered reasons for their conduct were pretexts for discrimination or that the true reason was discriminatory animus. *Hadeed,* 265 F. Supp. 2d at 623. First, there is no evidence in this record that raises a reasonable inference that the proffered reasons were not factually true. As reflected in his contemporaneous communications, Brondum was, in fact, undecided about whether to sell the house until April 20, 2011. He told Martin the townhouse was not for sale on February 27, 2011 because he had, in fact, made the decision not to sell the townhouse, given its condition, as he observed it on February 25. Martin had engaged in the conduct that Brondum found offensive and litigation was pending at the time that Brondum definitively decided to sell the townhouse. Likewise, because of the condition of the townhouse, which Brondum attributed to the Plaintiffs, Brondum decided to place the townhouse on the market in "as is" condition without first re-occupying it and at what Brondum considered a discounted price because of its condition.[9]

Second, this case is different than many, if not most, housing discrimination cases in that the alleged discrimination followed a long period of contractual dealings between the parties without any evidence of discrimination. *Compare, e.g., Havens Realty Corp. v. Coleman,* 455 U.S. 363, 368 (1982). Here, the Plaintiffs had lived at the property since September 2003, over seven years before this dispute arose, and while there were certainly disputes over certain terms

---

[9] Plaintiffs point to the removal of the "For Sale" sign on April 27, 2011, the same day it was put up, as evidence of both racial animus and pretext; but neither contention is supported by the record, which includes Long and Foster's recommendation that offering to sell the townhouse might complicate Brondum's damages claim in the then-pending state-court litigation between the parties.

of that tenancy, there is nothing in this record that would suggest any racially or ethnically motivated conduct by Defendants before Martin received the notice to vacate on January 31, 2011.[10] This nearly eight-year relationship by itself is strong evidence that Defendants' actions after Martin's refusal to vacate or pay rent were not motivated by racial animus.

Third, it is undisputed that Brondum, the owner of the townhouse, had never met either plaintiff before February 25, 2011, when he first inspected the townhouse; and there is no evidence in the record to establish that Brondum even knew the race or ethnicity of either plaintiff before that inspection. For that reason, the record establishes that before he knew the race or ethnicity of either plaintiff, Brondum decided that he wanted to obtain possession of the townhouse and instructed Long and Foster to take steps to obtain that possession, which it did through the 30-day notice to vacate served on Martin on January 31, 2011. He also decided, before learning of either plaintiff's race or ethnicity, that because of Martin's conduct after receiving the notice to vacate, he did not want to deal with Martin and that any dealings with respect to her expressed interest in the townhouse had to be pursued formally and with caution. *See* Brondum's February 19, 2011 email, attached as Ex. N to Pls.' Mem., at 26 ("Considering the difficulties this tenant has already caused, in addition to not having paid this month's rent (at least that is my understanding), I am not inclined to deal with her on any level, particularly given Mr. Timpane's comment doubting her ability to afford the property. I want her out of the property at the end of her lease term, otherwise, we are to proceed to eviction immediately as I need to get the property on the market and have plans to occupy in that property until it is sold.

---

[10] Those disputes between Plaintiff Martin and Long and Foster related to a number of issues, including whether Martin's rental payments were timely or technically late, whether Martin had paid the correct amount of rent in light of disputed late fees, whether Martin would enter into another written lease agreement in October 2005, at the expiration of Martin's initial 2-year lease on the property, as well as disputes over what the terms of that lease would be, and Martin's continuing to live at the property without a written lease, on a month-to-month basis.

If she is interested in buying the property, she can hire a real estate agent who can make an offer through my agent. I am not going to deal with her directly under any circumstances, as she appears to be quite irrational.") (emphasis in original).

Fourth, Brondum's position with respect to selling the townhouse or dealing with Martin, as expressed on February 18, did not change after he met Plaintiffs on February 25, at which time he reiterated his position that if Plaintiffs were interested in purchasing the townhouse, they should proceed formally through Long and Foster's identified sales agent, as he had previously instructed.

Fifth, the record does not support Plaintiffs' contentions that Long and Foster and its agents were misrepresenting to them Brondum's true intentions with respect to the disposition of the property.[11] Even when viewed in the light most favorable to Plaintiffs, the record establishes that at each point in time, Long and Foster accurately conveyed to Plaintiffs Brondum's thinking and intentions, including when he was willing to consider actual offers and when he had decided not to sell the townhouse. At most, the record, viewed most favorably to Plaintiffs, reflects some uncertainty, unsettled thinking, and changing assessments on Brondum's part concerning what to do with the property and when, particularly after he saw the physical condition of the property during his inspection on February 25, 2011.

Sixth, based on what Martin had told them, Defendants reasonably believed that Plaintiffs were not in a position to purchase the townhouse on acceptable terms and that any negotiations

---

[11] Plaintiffs' belief that Long and Foster was misrepresenting Brondum's intentions appears to be based in large part on what they saw as facially inconsistent reasons for Brondum's decision to end Martin's tenancy, as stated in the two separate 30-day notices to vacate that Martin received on January 31, 2011. One said that "the owner is returning to the property" and the other that "[t]he owner will be placing the property on the market for sale." Both statements appear to have in fact been true. As stated above, in an email to Timpane on February 19, 2012, Brondum stated, "I want her out of the property at the end of her lease term . . . as I need to get the property on the market and have plans to occupy in that property until it is sold." Ex. N to Pls.' Mem., at 26.

with Martin would be difficult.  For example, even before Brondum had met Plaintiffs for the

first time on February 25, 2011, Plaintiffs had already complained to Long and Foster about the

financial pressures they were under, including that they had not yet been approved for a

mortgage and were not in a position to ". . . put together a downpayment on a house for sale

under such short notice and such circumstances." Ex. W to Pls.' Mem., at 44.  Martin had also

staked out her position that a portion of her rental payments should be applied to the purchase

price and that she should not be assessed any financial responsibility for any damage to the

townhouse.

Plaintiffs appear to argue that Brondum was under some obligation to contact them and

assess their interest in purchasing the townhouse after he made the decision on April 20, 2012 to

place the townhouse on the market, and that Brondum's failure to contact them demonstrates his

racial animus.  Brondum had no such obligation; and on this record, there can be no reasonable

inference of racial animus based on his decision not to attempt any further dealings with Martin

with respect to purchasing the townhouse.  As discussed earlier, Brondum, for nondiscriminatory

reasons, had decided in February not to deal with Martin except through his agents based on

formal written offers, and Plaintiffs were informed of his position.  Plaintiffs never made such an

offer; at most, they were prepared to discuss purchasing the townhouse if they could receive

certain concessions.  When Brondum decided not to sell the property at the end of February,

again for nondiscriminatory reasons, Plaintiffs were so advised.  By the time he placed the

property on the market in April of 2011, the prospect of selling to or negotiating with Martin,

viewed from Brondum's prospective, continued to be an unattractive option for completely

nondiscriminatory reasons. *Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 280 (4th Cir. 2000) ("It is

the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.")

(citations and internal quotation marks omitted); *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000) (explaining that a defendant's burden to give a legitimate nondiscriminatory reason under *McDonnell Douglas* is one of production, not persuasion, and involves no credibility assessment of the evidence proffered).  By that time, the parties were embroiled in a lawsuit concerning outstanding rents and damage to the townhouse.  Brondum had no reason to think that the financial issues that Martin had previously identified had been eliminated; and on a personal level, Brondum could reasonably think, as he did, that any dealings with Martin were fraught with risks and that if given the opportunity she would "drag this situation down another dark path."  *See* Ex. KK to Pls.' Mem., at 14-15.

The Court has also reviewed the specific statements Plaintiffs rely on as direct proof of racial animus and as facts sufficient to support an inference of pretext.[12]  The Court concludes as a matter of law that these specific statements, taken in context, would not allow a jury to find that any defendant was motivated by racial animus or that Brondum's reasons for not actually selling the property to Plaintiffs were racially motivated.[13]  There is simply no evidence that would

---

[12] These include the following:

(1) Timpane's statement to Brondum that "I doubt she can afford the property . . . .";
(2) Knight's statement about Gallardo alleging "He's living here illegally! . . . He should have filled out an application."
(3) Brondum referring to Martin as "a real piece of work" and his statement to Haughton that "the 'POS' has left";
(4) Brondum's statement "I did a walk-through of the place . . . total animals";
(5) Brondum's statement "the way I feel is that it is my decision if I want to sell and to whom (and I can change my mind as needed)";
(6) Brondum's statement that "they had told him that they had *some people from Haiti* staying there."

[13] The specific context for these statements is the following:

(1) Timpane's comment about whether Plaintiffs could "afford the property" was made after Martin's email to Amantangelo on February 18, 2011, in which Martin outlined several financial considerations that would affect her ability to purchase the property.

permit a jury to find Defendants' proffered reasons were pretext without engaging in unwarranted speculation.

For the above reasons, the Court finds and concludes as a matter of law, based on undisputed facts, that Plaintiffs have failed to establish their claim of housing discrimination and that summary judgment should be entered in favor of Defendants and against the Plaintiffs.[14]

## CONCLUSION

For the above reasons, the Court will grant the motions for summary judgment filed by the Long and Foster Defendants [Doc. No. 92] and Defendant Johannes Brondum [Doc. No. 95] and deny Plaintiffs' Motion for Summary Judgment [Doc. No. 105].

---

(2) Knight's comment that Gallardo was living in the townhouse "illegally" was made after she first learned that Gallardo was living at the property under conditions that she thought violated the lease.

(3) Brondum's statements to Haughton that Martin was a "a real piece of work" and referring to Martin as a "POS" were in the context of Martin's refusal to vacate as demanded, the eviction lawsuit that was filed, Martin's counterclaims, and the condition of the townhouse, as Brondum found it after Martin vacated.

(4) Brondum's email stating that Plaintiffs had been living like "total animals" was made in reaction to the condition of the property that he observed and described based on his inspections of the townhouse.

(5) Brondum's comment in an email to Haughton that "the way I feel is that it is my decision if I want to sell and to whom (and I can change my mind as needed)," was within the context of Brondum's determining how to proceed with the property based on changing circumstances, including his own financial situation, the condition of the townhouse, which he attributed to bad conduct on the part of Martin, and Martin's claims of discrimination against him in the eviction lawsuit.

(6) Brondum's reference to "*some people from Haiti* staying there" was made at a deposition in this case and referred to Plaintiff Gallardo's comment during the inspection on February 25, 2011 that a famous Haitian musician had stayed at the property.

[14] The Virginia Human Rights Act does not create an independent cause of action except under limited exceptions not applicable here. *See* Va. Code. § 2.2-3903(A); *Wells v. BAE Sys. Norfolk Ship Repair*, 483 F. Supp. 2d 497, 512 (E.D. Va. 2007); *Ennis v. Nat'l Ass'n of Bus. & Edu. Radio, Inc.*, 53 F.3d 55, 57 (4th Cir. 1995) (explaining that the Virginia Human Rights Act only applies where there has been found a violation of other existing laws). Therefore, for the same reasons that the Court concludes judgment should be entered in favor of Defendants with respect to Plaintiffs' Fair Housing Act, the Court concludes that Defendants are entitled to judgment with respect to Plaintiffs' claim under the Virginia Human Rights Act.

An appropriate Order will issue.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
September 11, 2012